## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| **v.** | : | **VIOLATION:** |
| | : | **18 U.S.C. § 371** |
| **MARK DENNIS ZACHARES,** | : | **(Conspiracy)** |
| | : | |
| **Defendant.** | : | |

## INFORMATION

The United States of America charges that:

## COUNT ONE

### 18 U.S.C. § 371 - Conspiracy

### INTRODUCTION

<u>The Defendant</u>

1.   From 1994 to 1998, Defendant MARK D. ZACHARES (ZACHARES) was employed by

the office of the Attorney General in Saipan, Commonwealth of the Northern Mariana

Islands (CNMI), which is a Commonwealth in political union with the United States;

from 1998 to January 2002, ZACHARES served as Secretary of the Department of Labor

and Immigration for the CNMI.

2.   In or about June 2002 and through November 2004, ZACHARES served in various

positions on the staff of the Transportation & Infrastructure Committee of the United

States House of Representatives; specifically, ZACHARES served: (a) from June 2002

through December 2002 as Legal Counsel to the Oversight & Investigations

Subcommittee; (b) from January 2003 through December 2003 as Staff Director for the

Coast Guard & Maritime Subcommittee; and (c) from January 2004 through November

2004, as Special Counsel to the Transportation & Infrastructure Committee.

The Lobbyists and Their Clients

3.   Jack Abramoff was a Washington, D.C. lobbyist representing numerous clients, including

the government of the CNMI, which Abramoff represented from 1996 to 2001, receiving

fees in excess of $7 million.

4.   Beginning in the mid-1990s, ZACHARES came to have extensive contact with Abramoff

during ZACHARES' tenure as an official of the CNMI, and ZACHARES and Abramoff

became personal and professional acquaintances.

5.   At all relevant times, Abramoff and lobbyists working with Abramoff ("his lobbyists")

represented numerous clients with issues before the United States Congress and federal

departments and agencies.  ZACHARES also knew that Abramoff owned or controlled a

number of business interests, including Sun Cruz, a gambling vessel venture in South

Florida, and Signatures, a Washington, D.C. restaurant, and that Abramoff and his

lobbyists also controlled luxury box, floor (for basketball) and ice (for hockey) seats at

the MCI Center Arena in Washington, D.C. (now known as the Verizon Center), and

luxury suites at FedEx Field in Maryland.

6.   On repeated occasions from late 2000 through in or about April 2004, ZACHARES

communicated with his coconspirators, including Abramoff and his lobbyists, in

furtherance of the below-described conspiracy to defraud using interstate electronic mail

transmissions and interstate telephone calls.

2

## THE CONSPIRACY AND ITS OBJECTS

7.    From in or about late 2000 through in or about April 2004, in the District of Columbia, and elsewhere, the defendant,

### MARK D. ZACHARES,

did knowingly conspire, confederate and agree with Jack Abramoff and other persons known and unknown to the United States to commit offenses against the United States, that is, to devise a scheme and artifice to defraud and deprive the United States House of Representatives and the people of the United States of their right to the honest services of ZACHARES performed free from deceit, fraud, bias, conflict of interest, self-enrichment and self-dealing, and to use interstate wire communications for the purpose of executing the scheme and artifice, in that ZACHARES accepted from Abramoff and his lobbyists a stream of things of value intending to be influenced to take and to be rewarded for taking a stream of favorable official action, all in violation of Title 18, United States Code, Sections 1343 and 1346.

## PURPOSE OF THE CONSPIRACY

8.    It was a purpose of the conspiracy for ZACHARES to enrich himself by using and agreeing to use his official positions within the House of Representatives Transportation & Infrastructure Committee, and by performing and agreeing to perform official acts in return for a stream of things of value.

9.    It was a further purpose of the conspiracy to enrich Abramoff and his lobbyists by providing favorable official action to them and their clients, and by referring prospective clients to Abramoff and his lobbyists.

3

## MANNER AND MEANS

10.    The conspiracy was carried out through the following manner and means, pursuant to what

ZACHARES and Abramoff came to call their "two year plan":

a.    ZACHARES would and did take a stream of things of value from Abramoff and

his lobbyists, including the prospect of future employment as a lobbyist by

Abramoff and of salary enhancements in that prospective employment, an overseas

trip, monetary gifts, meals and drinks, golf, and tickets to professional sporting

events and concerts.

b.    In exchange for this stream of things of value, ZACHARES would and did provide

a stream of favorable official action to, and would and did use his influence on

behalf of, Abramoff, his lobbyists, and their clients.

c.    ZACHARES would and did use his Congressional position to develop the contacts

and influence that would make ZACHARES valuable as a future lobbyist working

with Abramoff, and would and did use his position to refer potential clients to

Abramoff's lobbying firm.  In return, Abramoff would "credit" ZACHARES with

the "business" ZACHARES, while in his official position, referred or developed

for Abramoff's firm, and would ultimately employ ZACHARES as a lobbyist

credited "with business," warranting a high annual salary.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purpose, ZACHARES and his co-

conspirators committed the following overt acts, among others, in the District of Columbia and

elsewhere:

4

### ZACHARES Solicited and Accepted a Stream of Things of Value from Abramoff and his Lobbyists

*Government Employment*

11.    From late 2000 through 2001, Abramoff contacted United States Executive Branch officials in an attempt to secure for ZACHARES an appointment as the Director of the Office of Insular Affairs (OIA) within the United States Department of the Interior (DOI), in Washington, D.C., a position important to many of Abramoff's lobbying clients, including the CNMI.

12.    In June 2002, Abramoff contacted Congressional personnel and assisted ZACHARES in obtaining his position as a staffer on the House Transportation & Infrastructure Committee.

13.    In November 2002, ZACHARES sent Abramoff a number of e-mails communicating ZACHARES' interest in obtaining a high-level position with the United States Department of Homeland Security, where ZACHARES could secure favorable treatment and government contracts for Abramoff's clients, including a November 26, 2002 e-mail in which ZACHARES stated he "really could make things happen if [he] got over to [Homeland Security]!"

*The $10,000 Payment*

14.    In January 2002, during the time that Abramoff and ZACHARES were discussing ZACHARES' Washington, D.C. employment prospects, ZACHARES solicited and received from Abramoff $5,000, by means of an interstate electronic wire transmission from an account assigned to the Capitol Athletic Foundation, a non-profit corporation

controlled by Abramoff, to ZACHARES' personal bank account in the CNMI.

15.    In February 2002, during the time that Abramoff and ZACHARES were continuing to

discuss ZACHARES' Washington, D.C. employment prospects, ZACHARES again

solicited and received from Abramoff $5,000, by means of an interstate electronic wire

transmission from an account assigned to the Capitol Athletic Foundation, a non-profit

corporation controlled by Abramoff, to ZACHARES' personal bank account.

*The 2003 Scotland Trip*

16.    From on or about August 9, 2003, through on or about August 14, 2003, ZACHARES,

Abramoff and six other individuals, including a Member of the United States House of

Representatives (Representative #3), traveled to Scotland to play golf on world-famous

courses.  Abramoff and his clients paid nearly all expenses for the trip for all participants,

including ZACHARES and Representative #3, including costs in excess of $160,000 for

private jet service between Maryland and Scotland, luxury hotel accommodations in

Scotland, twice-daily golf at St. Andrews and other famous courses, meals, drinks, and

local transportation.

*Tickets to Sporting Events and Concerts*

17.    On over forty occasions between in or about August 2002 and in or about February 2004,

Abramoff and his lobbyists provided and ZACHARES used approximately $30,000 worth

of tickets to Washington, D.C.-area sporting and entertainment events, including

numerous "floor" seats at the MCI Center (now Verizon Center) for Washington Wizards

games, "ice" seats at the MCI Center for Washington Capitals games, luxury box tickets

for sporting events and concerts at the MCI Center, and luxury box tickets at FedEx Field

for Washington Redskins games.

*Free Meals and Drinks*

18.    On numerous occasions during the course of the conspiracy, ZACHARES took free meals

and drinks at Abramoff's Washington, D.C. restaurant, Signatures, where ZACHARES

was often accompanied by members of his family or fellow Congressional staffers, who

also received free meals and drinks.

*Free Golf*

19.    On numerous occasions during the course of the conspiracy, ZACHARES took free rounds

of golf with Abramoff at the private Woodmore Country Club in Maryland, where

Abramoff was a member.

## ZACHARES Took a Stream of Official Acts to Assist Abramoff, his Lobbyists, and their Clients

20.    ZACHARES took a stream of official action benefitting Abramoff, his business interests,

his friends, and his lobbying clients.  The stream of official action included, but was not

limited to, the following:

    a.    On or about July 30, 2002, ZACHARES sought, at Abramoff's request, a

        United States Department of Justice Threat Assessment Report concerning

        Guam and the CNMI that was not then available to the public.

    b.    In or about November 2002, pursuant to a request by Abramoff,

        ZACHARES provided information to Abramoff about pending

        Congressional actions on the reorganization of the Department of

        Homeland Security that would assist Abramoff's potential business

opportunities and current clients.

c.    In or about November 2002, ZACHARES provided Abramoff contact

information for prospective businesses that would be affected by the

Homeland Security reorganization, so Abramoff could adjust his business

development strategies to build a Homeland Security lobbying practice that

would eventually benefit ZACHARES when he ultimately joined

Abramoff's firm as a lobbyist, pursuant to the "two year plan."

d.    In or about December 2002, ZACHARES advanced Abramoff's

prospective business with the Territory of Guam through ZACHARES'

official influence over disaster aid from the Federal Emergency

Management Agency ("FEMA") and through contact with FEMA

personnel.

e.    Between January and June 2003, ZACHARES sent e-mails to Abramoff

communicating his willingness to assist Abramoff and another lobbyist

with various legislative issues involving the Coast Guard and Maritime

Subcommittee, and to help with administrative issues involving the United

States Maritime Administration's regulation of financial assistance sought

by Abramoff for his Sun Cruz venture.

f.    On or about March 11, 2003, while ZACHARES was Staff Director for the

Coast Guard & Maritime Subcommittee, Abramoff sent an e-mail to

another lobbyist at Abramoff's firm regarding an upcoming meeting at

Signatures, and explaining the meeting as "related to the fact that Zack is

heading the staff and we need to get [two other lobbyists] doing something, and they know maritime.  We can get a ton of clients together, and they can do the work, with Zack pulling our load inside."

g.  In or about April 1, 2003, ZACHARES, Abramoff, and three of Abramoff's lobbyists met at Signatures to develop a maritime lobbying practice in which ZACHARES, Abramoff, and others would use ZACHARES' official position both to steer new lobbying clients to Abramoff's firm and to secure official action on maritime issues for Abramoff clients.

h.  In or about early 2004, ZACHARES met and coordinated with Abramoff and others how ZACHARES could advance federal support for a multi-million dollar highway development project benefitting a businessman.

i.  On a number of occasions in 2003 and 2004, ZACHARES, in his capacity as a House staffer, referred potential clients to Abramoff's lobbying firm.

j.  On a number of occasions between 2002 and early 2004, ZACHARES e-mailed Abramoff communicating his willingness to use his position to retaliate against individuals or entities who had retained competing lobbying firms, instead of Abramoff.

(All in violation of Title 18, United States Code, Section 371.)

Dated: 4/5/07

WILLIAM M. WELCH II
Chief, Public Integrity Section

Richard C. Pilger
Matthew L. Stennes
Trial Attorneys
Criminal Division
U.S. Department of Justice

10