FILED

APR 24 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ATTACHMENT A

CR 07-106.

FACTUAL BASIS FOR THE PLEA
OF MARK DENNIS ZACHARES

This statement is submitted to provide a factual basis for my plea of guilty to the conspiracy charge filed against me:

Background

1.  Defendant MARK DENNIS ZACHARES, was employed by the Office of the Attorney General in Saipan, Commonwealth of the Northern Mariana Islands (CNMI) from 1994 to 1998, and as Secretary of the Department of Labor and Immigration (DOLI) for the CNMI from 1998 to January 13, 2002; the CNMI is a political commonwealth of the United States.

2.  As an official of the CNMI, ZACHARES came to have extensive contact with Jack Abramoff. Abramoff was a lobbyist working with a Washington, D.C. lobbying firm. Abramoff represented the government of the CNMI from 1996 to 2001, receiving fees in excess of $7 million.

3.  ZACHARES and Abramoff became personal and professional acquaintances during ZACHARES' tenure as an official of the CNMI.

4.  No later than October 2000, during ZACHARES' tenure as Secretary of DOLI, Abramoff and ZACHARES discussed the prospect of Abramoff finding a job for ZACHARES in Washington, D.C.

5.  From in or about late 2000 through 2001, Abramoff attempted to secure for ZACHARES an Executive Branch appointment as the Director of the Office of Insular Affairs (OIA) within the United States Department of the Interior (DOI), which, among other things, administers federal funds appropriated to the CNMI, a position that was important to Abramoff's

lobbying interests. However, for reasons beyond the control of ZACHARES and Abramoff, ZACHARES failed to secure the OIA position.

6. In January and February 2002, during the time Abramoff and ZACHARES were planning ZACAHRES' move to a Washington, D.C. government position, Abramoff caused two $5,000 payments to be wired from the Capitol Athletic Foundation (CAF), an Abramoff-controlled entity, to ZACHARES' personal bank account. While Abramoff directed ZACHARES to describe the payment as consulting work, ZACAHRES did not perform any such work in exchange for these payments.

7. In June 2002, with the assistance of Abramoff and others, ZACHARES was hired onto the staff of the Transportation & Infrastructure Committee of the United States House of Representatives, a position in Washington, D.C. ZACHARES moved to Washington, D.C. in June 2002.

8. From June 2002 through November 1, 2005, ZACHARES served in various high-level positions on the House Transportation & Infrastructure Committee: (a) from June 2002 through December 2002 as Legal Counsel to the Oversight & Investigations Subcommittee; (b) from January 2003 through December 2003 as Staff Director to the Coast Guard & Maritime Subcommittee; and (c) from January 2004 through November 1, 2005 as Special Counsel to the Transportation & Infrastructure Committee. In each position, ZACHARES was compensated with a high-level salary, sufficient to trigger the reporting requirements of the Ethics in Government Act.

9. In November 2002, ZACHARES and Abramoff discussed ZACHARES' desire to secure a high-level position with the United States Department of Homeland Security. In such a

position, ZACHARES could have secured favorable treatment and government contracts for Abramoff's clients. ZACAHRES ultimately remained in his position with the United States Congress, rather than making such a move.

10. ZACHARES knew that Abramoff and his firm represented numerous clients with issues before the United States Congress and federal departments and agencies. ZACHARES knew that Abramoff owned or controlled a number of business interests, including a Washington, D.C. restaurant, Signatures. ZACAHRES also knew that Abramoff and his lobbying firm controlled a luxury box and floor (for basketball) and ice (for hockey) seats at the MCI Center Arena in Washington, D.C. (now known as the Verizon Center), and luxury suites at Fed Ex Field in Maryland.

<u>Scheme to Defraud the House of Representatives and the Public of Zachares' Honest Services</u>

11. Beginning in or about late 2000 and continuing through in or about April 2004, ZACHARES joined a conspiracy involving Abramoff and others, using mail and interstate wire communications, to deprive the public of the honest services of ZACHARES. That is, ZACHARES solicited and accepted a stream of things of value from Abramoff and others with the intent to be influenced in his official actions and to agree to take official actions at Abramoff's request. Abramoff and others provided the stream of things of value knowing that it was received by ZACHARES with the intent to be influenced in his official action and to deprive the House of Representatives and the public of his honest services.

*The Two-Year Plan*

12. ZACHARES and Abramoff had what they came to call by November 2002 a "two year plan" for ZACHARES, by which ZACHARES would and did work for Abramoff's interests

on Capitol Hill, would and did develop the contacts and influence that would make ZACHARES valuable as a future lobbyist (including participation in the selection of his successor on the Committee staff), and would and did use his official acts and influence as a Congressional staffer to assist both Abramoff's personal business interests and interests concerning Abramoff's current and prospective clients. In return, Abramoff would "credit" ZACHARES with the "business" ZACHARES referred or developed as a Congressional staffer, and would ultimately employ ZACHARES as a lobbyist credited "with business," earning a high annual salary. In the meantime, ZACHARES enjoyed Abramoff's largesse in the form of continuous, extensive, and luxurious gifts while ZACHARES worked for Abramoff's interests as a federal employee on Capitol Hill.

***Things of Value***

13.     As part of the conspiracy described in paragraph 11, the stream of things of value solicited and accepted by ZACHARES and paid for by Abramoff, his lobbying firm, and their clients in exchange for the stream of official action, included, but was not limited to, the following:

    a.   two payments of $5,000 made by Abramoff to ZACHARES in January 2002 and February 2002, during the time Abramoff and ZACHARES were planning ZACHARES' Washington, D.C. employment prospects;

    b.   an all-expense-paid trip to play golf with Abramoff and six other individuals, including a Member of the United States House of Representatives ("Representative # 3"), in Scotland, at St. Andrew's and other world-famous courses, in August 2003, with total trip costs

exceeding $160,000;

c. tickets on over forty occasions for ZACHARES, his family, his friends, and fellow-House staffers to attend sporting events and concerts at the MCI Center and FedEx Field; the value of the tickets received by ZACHARES during the course of the conspiracy totaled more than $30,000;

d. numerous free meals and drinks at Abramoff's Signatures restaurant;

e. numerous free rounds of golf at Abramoff's country club;

*Official Acts*

14. ZACHARES took and agreed to take a stream of official action benefitting Abramoff, and Abramoff's business interests, friends, and lobbying clients. The stream of official action included, but was not limited to, the following:

a. On July 30, 2002, ZACHARES attempted to obtain, at Abramoff's request, a United States Department of Justice Threat Assessment Report concerning Guam and the CNMI that was not then available to the public.

b. In November 2002, pursuant to a request by Abramoff, ZACHARES provided information about pending Congressional actions on the reorganization of the Department of Homeland Security that would assist Abramoff's potential business opportunities and current clients.

c. ZACHARES also offered to and did provide Abramoff contact information for prospective businesses that would be affected by the Homeland Security reorganization, so Abramoff could adjust his business

        development strategies to build a Homeland Security lobbying practice by which ZACHARES would eventually benefit when he ultimately began lobbying with Abramoff.

d.     In November 2002, ZACHARES and Abramoff discussed ZACHARES' desire to secure a high-level position in the Department of Homeland Security, where ZACHARES could secure favorable treatment and government contracts for Abramoff's clients.

e.     In December 2002, ZACHARES offered to and did advance Abramoff's prospective business with the Territory of Guam through his official influence over disaster aid from the Federal Emergency Management Agency ("FEMA") and through contact with FEMA personnel.

f.     Between January and June 2003, ZACHARES agreed to assist Abramoff and another lobbyist with various legislative issues involving the Coast Guard & Maritime Subcommittee, and with administrative issues involving the United States Maritime Administration (MARAD), all of which would have impacted Abramoff's Sun Cruz gambling ship venture.

g.     In March and April 2003, ZACHARES, Abramoff, and lobbyists with his lobbying firm planned to develop a "maritime practice" in which ZACHARES, Abramoff and others would use ZACHARES' official position both to steer new lobbying clients to Abramoff's firm and to secure official action on maritime issues for those and other Abramoff clients. In an e-mail dated March 11, 2003, Abramoff explained the plan

        to another lobbyist at Abramoff's firm as "related to the fact that Zack is heading the staff and we need to get [two other lobbyists] doing something, and they know maritime. We can get a ton of clients together, and they can do the work, with Zack pulling our load inside."

    h.    On or about April 1, 2003, ZACHARES, Abramoff, and three other lobbyists from Abramoff's firm convened a meeting at Signatures to discuss the planned maritime practice and ZACHARES' role in the success of the project as Special Counsel to the Coast Guard & Maritime Subcommittee.

    i.    In early 2004, ZACHARES met and coordinated with Abramoff and others to advance passage of a multi-million dollar highway development project benefitting a businessman.

    j.    On a number of occasions in 2003 and 2004, ZACHARES, in his capacity as a House staffer, referred potential clients to Abramoff's lobbying firm.

    k.    On a number of occasions between 2002 and early 2004, ZACHARES offered to Abramoff to use his position to get back at lobbying clients who had retained competing lobbying firms, instead of Abramoff.

15.    On repeated occasions from October 2000 through in or about March 2004, ZACHARES communicated regularly with others, including Abramoff, in furtherance of his plan with Abramoff, and did so using interstate electronic mail transmission and interstate telephone calls.

Other Relevant Conduct Reflecting Intent Relating to the Charged Scheme

16.     ZACHARES knowingly concealed and misrepresented material facts regarding his receipt of the stream of things of value from Abramoff and others by, among other things, falsifying the following forms:

      a.    ZACHARES' Travel Disclosure Form for 2003 Scotland Trip: On September 29, 2003, ZACHARES filed a Travel Disclosure Form with the Office of the Clerk, United States House of Representatives, which: (1) falsely reported the August 2003 trip to Scotland as sponsored by the National Center for Public Policy Research; (2) falsely reported the official purpose of the trip as "Fact-Finding;" (3) falsely reported the cost of transportation, lodging, and meals as only $5,643, a figure coordinated with Abramoff to be substantially identical as the figures other attendees, including Representative # 3, would report; and (4) omitted as "Other Expenses" the fact that he had received free golf at world-class Scottish golf courses during the trip. In fact, as ZACHARES knew, the costs were higher, there was no official purpose, and ZACHARES attended the trip for the free golf and to further his relationship and plan with Abramoff.

      b.    ZACHARES' 2002 Financial Disclosure Form: On May 14, 2003, ZACHARES signed, and on May 15, 2003, he filed a Financial Disclosure Statement for Calendar Year 2002 with the Office of the Clerk, United States House of Representatives. ZACHARES intentionally failed to disclose on this form: (1) that he had received $10,000 in cash payments

from Abramoff, a lobbyist, shortly before starting work for the House; and (2) that he had received thousands of dollars worth of sporting event and concert tickets from Abramoff, each of which had reportable values of more than $114. ZACHARES knew he was required to disclose these facts in this publicly-available filing.

c. <u>ZACHARES' 2003 Financial Disclosure Form</u>: On May 17, 2004, ZACHARES signed and filed a Financial Disclosure Statement for Calendar Year 2003 with the Office of the Clerk, United States House of Representatives. ZACHARES intentionally failed to report that he had received thousands of dollars worth of sporting event and concert tickets from Abramoff, each of which had reportable values of more than $114. ZACHARES also failed to disclose that he had received free rounds of golf and other benefits while on the Scotland trip that had a value far in excess of the $114 reporting threshold. ZACHARES knew he was required to disclose these facts in this publicly-available filing.

d. <u>ZACHARES' 2004 Financial Disclosure Form</u>: On May 16, 2005, ZACHARES signed and filed a Financial Disclosure Form for Calendar Year 2004 with the Office of the Clerk, United States House of Representatives. ZACHARES intentionally failed to report that he had received thousands of dollars worth of sporting event and concert tickets in January and February 2004 from Abramoff, each of which had reportable values of more than $114. ZACHARES knew he was required

to disclose this fact in this publicly-available filing.

\* \* \*

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the conspiracy charge against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

Date: 3/14/07

MARK DENNIS ZACHARES

Edward MacMahon, Jr., Esq.
Counsel for Defendant